In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2986

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES E. SNYDER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:16-cr-00160-MFK-2 — **Matthew F. Kennelly**, *Judge.*[*]

ARGUED JANUARY 18, 2023 — DECIDED JUNE 15, 2023

Before HAMILTON, JACKSON-AKIWUMI, and LEE, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Appellant James Snyder is a former mayor of Portage, Indiana. He was convicted of federal funds bribery in violation of 18 U.S.C. § 666(a)(1)(B) for soliciting and accepting $13,000 in connection with the city's

---

[*] Of the Northern District of Illinois, sitting by designation.

purchases of garbage trucks. Snyder was also convicted of obstructing the administration of federal revenue laws in violation of 26 U.S.C. § 7212(a) for concealing assets and income from the IRS. Snyder was sentenced to 21 months in prison and one year of supervised release. Snyder has appealed, challenging his convictions on several grounds. We affirm.

I.  *Factual and Procedural History*

A.  *Purchases of Garbage Trucks by the City*

We begin with a summary of the facts, adding more details below as relevant for each of Snyder's challenges. Snyder was elected mayor of Portage, Indiana and took office in January 2012. In December 2012 and November 2013, his administration announced that it would purchase garbage trucks for the city through public bidding. Both contracts were awarded to Great Lakes Peterbilt (GLPB), a Portage truck dealer owned by two brothers, Robert and Stephen Buha. The mayor put his longtime friend Randy Reeder in charge of the bidding process. Reeder testified at trial that he drafted the bid specifications to favor GLPB. Evidence at trial also showed that Mayor Snyder was in frequent contact with the Buha brothers—but no other bidders—during the bidding process. Less than three weeks after the second contract was awarded, GLPB paid Snyder $13,000.

B.  *Snyder's Dealings with the IRS*

Years before Snyder was elected mayor, his business, First Financial Trust Mortgage, failed to pay its payroll taxes in full for 2007, 2008, and 2009. The IRS then levied its bank accounts. Shortly after the levy, Snyder made an arrangement with another mortgage company, GVC Mortgage, whereby Snyder would manage and operate First Financial Trust

Mortgage as a division of GVC Mortgage. Snyder sent invoices to GVC Mortgage for costs ostensibly incurred in operating First Financial Trust Mortgage. But rather than having GVC Mortgage reimburse First Financial Trust Mortgage, Snyder had GVC Mortgage send reimbursements to a different company that Snyder had created called SRC Properties. If the reimbursement checks had been deposited into First Financial Trust Mortgage's bank account, they would have been subject to the IRS levy.

Snyder was also behind in paying his personal taxes, and in December 2010 and February 2011, the IRS levied his personal bank accounts. In trying to negotiate a settlement or installment plan with the IRS on his personal taxes, Snyder submitted three Form 433-As. In each, he purported to disclose fully his assets and liabilities under penalty of perjury. On all three forms, Snyder failed to report that he owned SRC Properties, and on two of the forms, he omitted his employment with GVC Mortgage.

C. *District Court Proceedings*

In November 2016, a federal grand jury indicted Snyder for federal funds bribery and obstructing the IRS. He went to trial in January and February 2019. The jury convicted on one count of federal funds bribery and one count of obstructing the IRS and acquitted Snyder on a separate bribery charge involving the city's towing contracts. Snyder then moved for a judgment of acquittal or a new trial on the counts of conviction. The district court denied the motion for acquittal but granted Snyder a new trial on the bribery charge. Snyder was

retried on the bribery charge in March 2021, and the jury again returned a verdict of guilty.[1]

Snyder now appeals, challenging decisions on motions to dismiss, jury instructions, and sufficiency of the evidence. We have organized Snyder's challenges into three parts. Part II addresses Snyder's argument that the district court erred in denying his motion to dismiss the indictment or disqualify the prosecution team after the government, pursuant to a search warrant, seized communications between Snyder and his attorney. Part III considers two challenges specific to the IRS obstruction count: his statute of limitations defense and the sufficiency of the evidence. Finally, in Part IV, we address speedy trial, jury instruction, and sufficiency-of-the-evidence challenges to Snyder's federal funds bribery conviction.

---

[1] Snyder's case was initially assigned to the late Judge Lozano before being reassigned in September 2017 to Judge Van Bokkelen, who presided over Snyder's first trial and who granted his motion for a new trial. In November 2020, the case was reassigned to Judge Kennelly of the Northern District of Illinois, sitting by designation, who presided over Snyder's second trial and imposed the sentence. Snyder's attorney from July 2014 until October 2017 had been Thomas L. Kirsch II, who took office on October 10, 2017 as United States Attorney for the prosecuting district, the Northern District of Indiana. On December 17, 2020, he took office as a United States Circuit Judge on the Seventh Circuit Court of Appeals. When Judge Kirsch took office as United States Attorney, responsibility for the prosecution shifted from the Northern District of Indiana to the Northern District of Illinois, and all personnel in the Northern District of Indiana were recused except for two trial attorneys and support staff who had already been working on the case. Attorneys for the Northern District of Illinois have also handled this appeal.

II. *Challenges to the Seizure of Snyder's Emails*

First, Snyder argues that the district court erred in denying his motion to dismiss the indictment or disqualify the prosecution team on the theory that the government intruded on his attorney-client relationship. Snyder contends that his Fourth and Sixth Amendment rights were violated when, pursuant to an overbroad warrant, the government seized communications between him and his attorney and then employed a filter process to screen for privileged communications without oversight by a court or defense counsel.

A. *Background*

In September 2015, the government obtained a search warrant for Snyder's personal and City of Portage email accounts. At that time, Snyder had not yet been indicted, but he knew he was under investigation and had retained counsel. The government was aware that Snyder had retained counsel, so it developed a filter process to prevent the prosecution team from receiving privileged communications among Snyder's emails seized under the warrant.

At an evidentiary hearing in the district court, the lead FBI agent testified that after he received data from Snyder's email providers, he arranged for the data to be copied, secured the original hard drive, and then sent the copied data to the FBI's Investigative Data Management System. The agent provided a list of search terms to identify potentially privileged communications, which the computer applied to "quarantine" roughly 8,600 of 109,000 emails. A team of FBI employees who were not otherwise involved in Snyder's case then examined the quarantined documents. Those employees were not attorneys but were instructed on criteria for privileged attorney-

client communications and were advised to err on the side of caution. Of the roughly 8,600 emails sent to the team, they identified 900 as potentially privileged. Those 900 emails were then sent to an Assistant U.S. Attorney for a final review. The reviewing attorney worked in the same office as the prosecution team but was not otherwise involved in Snyder's case. She identified roughly 300 emails as privileged, which were not provided to the prosecution team.

Snyder was indicted in November 2016. In February 2018, he moved to dismiss the indictment, or, in the alternative, to disqualify the prosecution team. He argued that members of the prosecution team intruded on his attorney-client relationship by reviewing privileged communications with his attorney in violation of the Sixth Amendment. Snyder identified roughly forty emails that he argued were privileged but had been shared with the prosecution team. Snyder also argued that the search warrant was overbroad, in violation of the Fourth Amendment.

Judge Van Bokkelen denied Snyder's motion. *United States v. Snyder*, No. 2:16-CR-160 JVB, 2018 WL 4637253, at *9 (N.D. Ind. Sept. 27, 2018). The court began by analyzing whether any of the forty-some emails Snyder identified were indeed privileged. The court identified three exhibits that should not have been shared with the prosecution team. Two were emails regarding consulting contracts, but they were not related to this case. The third was a compilation of emails containing Quickbooks financial data that Snyder had generated upon his attorney's request. The government already had access to at least some of the Quickbooks data, but the court found that Snyder suffered some prejudice by the disclosure because the Quickbooks emails made it easier for the government to

analyze his finances. The court prohibited the prosecution team from using the Quickbooks data or evidence stemming from it at trial. *Id.* at *8.

The court then evaluated the government's filter process. The court commented that the process had a "semblance of the fox guarding the hen house," but the court concluded that participation by a magistrate judge or Snyder's attorney was not required. *Snyder*, 2018 WL 4637253, at *6. The court credited the FBI agent's testimony that he sent Snyder's emails for computerized review without examining them. More generally, the court found that the "Chinese wall" between the filter team and the prosecution had not been breached. *Id.* The court also found no evidence indicating that the three privileged exhibits shared with the prosecution were disclosed intentionally.

Turning to the constitutional arguments, the court found no violation of the Sixth Amendment. The emails had been seized and the filter process completed before Snyder was indicted in November 2016, and only at that time did his Sixth Amendment right to counsel attach. *Snyder*, 2018 WL 4637253, at *7. The court also concluded that seizure of Snyder's emails under the warrant did not violate the particularity requirement of the Fourth Amendment. *Id.* at *8.

B. *Analysis*

We review the district court's findings of fact for clear error and its legal conclusions de novo. See *United States v. Pace*, 48 F.4th 741, 747 (7th Cir. 2022); *United States v. Arceo*, 535 F.3d 679, 684 (7th Cir. 2008).

1. *Fourth Amendment*

On appeal, Snyder argues that the government's warrant was overbroad because it sought "all information" associated with his email accounts and was not limited by date or time. Snyder notes that the warrant affidavit focused on events that occurred from 2011 through 2014, and he suggests that the warrant should have been limited to that time frame.

The Fourth Amendment requires that warrants be supported by probable cause and that they "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement is intended to prevent "the issuance of a warrant that permits a 'general, exploratory rummaging in a person's belongings,'" and "thereby ensures that the scope of a search will be confined to evidence relating to a specific crime that is supported by probable cause." *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). "Warrants that are overbroad, that is, that allow officers to search for items that are unlikely to yield evidence of the crime, violate the Fourth Amendment." *United States v. Vizcarra-Millan*, 15 F.4th 473, 502 (7th Cir. 2021).

Even if we assume that the warrant might have been overbroad in violation of the Fourth Amendment, the district court did not err in denying Snyder's motion to dismiss. The remedy for such Fourth Amendment violations in a criminal proceeding is suppression of the evidence, not dismissal of the indictment or disqualification of the prosecution team. *United States v. Morrison*, 449 U.S. 361, 366 (1981) (remedy for searches and seizures contrary to Fourth Amendment in

criminal proceeding "is limited to denying the prosecution the fruits of its transgression"). We deny this challenge.[2]

## 2. *Sixth Amendment*

Snyder next argues that the district court erred in finding no violation of his Sixth Amendment rights. He insists that the government's filter process was deficient because it was conducted solely by government agents, without court oversight or participation by Snyder's counsel. Snyder characterizes the seizure of emails and the challenged filter process as an intentional intrusion into his attorney-client relationship for which dismissal of the indictment was an appropriate remedy.

The Sixth Amendment guarantees assistance of counsel to the "accused" in "all criminal prosecutions." U.S. Const. amend. VI. The right "is limited by its terms" and "'does not attach until a prosecution is commenced.'" *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2007), quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). More specifically, the right to counsel attaches upon "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.*, quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984).

The attorney-client privilege, by contrast, is not a constitutional right but an evidentiary privilege. *Lange v. Young*, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989). It applies in criminal and civil proceedings to protect confidential communications between attorney and client made for the purpose of seeking or providing legal advice. *United States v. BDO Seidman, LLP*, 492

---

[2] If Snyder's challenge had come to us as an appeal from a denial of a motion to suppress, we expect that we would have had to consider other issues, including whether the officers relied on the warrant in good faith.

F.3d 806, 815 (7th Cir. 2007). A violation of the attorney-client privilege is not a per se violation of the Sixth Amendment. Nevertheless, a government intrusion into the attorney-client relationship can in some circumstances violate the Sixth Amendment. See, e.g., *Shillinger v. Haworth*, 70 F.3d 1132, 1134–36, 1138 (10th Cir. 1995) (holding that Haworth's Sixth Amendment rights were violated when deputy sheriff, who was present at meetings between Haworth and his attorney, disclosed defense's trial strategy to the prosecution, who used that information to impeach Haworth at trial); *Bishop v. Rose*, 701 F.2d 1150, 1151, 1155 (6th Cir. 1983) (finding Sixth Amendment violated where defendant's handwritten statement, prepared at his attorney's request, was discovered by prison guards, sent to the prosecutor, and used to impeach defendant's credibility at trial).

The seizure and filtering of Snyder's emails did not violate his Sixth Amendment right to counsel because the right had not yet attached. The government seized Snyder's emails in September 2015 and completed its filter process in early 2016, well before Snyder was indicted in November 2016. Because Snyder's Sixth Amendment right to counsel had not attached, the conduct he complains of could not violate that right. It makes no difference for purposes of the Sixth Amendment that Snyder had already retained counsel, who was representing him in negotiations with the government regarding criminal charges. *Moran v. Burbine*, 475 U.S. 412, 430 (1986) ("[I]t makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation."); *United States ex rel. Shiflet v. Lane*, 815 F.2d 457, 465 (7th Cir. 1987) (defendant "cannot claim the protection of the sixth amendment merely because

he retained counsel prior to the filing of charges against him").

Snyder nevertheless argues that even if the seizure and filter process occurred before he was indicted, those supposed violations unconstitutionally interfered with his post-indictment attorney-client relationship. He offers no controlling authority to support his expansive view of the Sixth Amendment. Even if the right had attached when the government seized Snyder's emails, the district court did not err in declining to dismiss the indictment. Although the filter process used here did not operate perfectly, we find no violation of the Sixth Amendment and no grounds for dismissing the case.

In *Weatherford v. Bursey*, 429 U.S. 545 (1977), the Supreme Court considered whether the presence of an undercover agent at a meeting between a defendant awaiting trial and his attorney violated the Sixth Amendment. The Court rejected the per se rule proposed by the defendant. *Id.* at 550–51. Instead, the Court found that under the facts before it, the Sixth Amendment was not violated. *Id.* at 558. The Court observed that the agent did not disclose the details of the conversation to the government, none of the state's evidence originated in the conversation, the agent did not testify about the conversation at trial, and, in short, the conversation was not "used in any other way to the substantial detriment" of the defendant. *Id.* at 554. The Court also stressed that the agent was invited to the meeting by the defendant. It was not a "situation where the State's purpose was to learn what it could about the defendant's defense plans." *Id.* at 557. Because there was "no tainted evidence in [the] case, no communication of defense strategy to the prosecution, and no purposeful intrusion" by

the agent, the defendant's right to effective assistance of counsel was not violated. *Id.* at 558.

Here, the seizure and filtering of Snyder's emails resulted in three privileged documents being shared with the prosecution team. Two documents concerned consulting contracts unrelated to the case against Snyder, so their disclosure caused no prejudice to Snyder in this case. The only disclosure that was possibly detrimental, the Quickbooks data, had already been shared in part with the government, and the district court ordered the government not to use the data or any evidence derived from it at trial. Moreover, after an evidentiary hearing, the district court found that there was "no evidence, or even suggestion," that the privileged files were shared with the prosecution team with the intent that they be used to prosecute Snyder. 2018 WL 4637253, at *6. As in *Weatherford*, there was here no intentional intrusion by the government, no tainted evidence from the few improper disclosures, and no communication of defense strategy. Under these circumstances, we find no violation of the Sixth Amendment right to counsel.

Still, Snyder argues that the filter process used in his case was deficient and that similar protocols have been rejected by the Third, Fourth, Sixth, and Eleventh Circuits. We disagree. As an initial matter, in none of the cases Snyder cites did the court find that a defective filter process violated the Sixth Amendment or required the indictment to be dismissed, as Snyder argues here.

Each case is distinguishable from Snyder's in other ways as well. The Eleventh Circuit in *In re Sealed Search Warrant & Application*, 11 F.4th 1235, 1252 (11th Cir. 2021), actually approved of the government's filter process. *In re Grand Jury*

*Subpoenas*, 454 F.3d 511 (6th Cir. 2006), concerned subpoenas, not a search warrant. Though the Sixth Circuit rejected the government's request to conduct a privilege review of documents subpoenaed from a third party, that rejection was based in part on the fact that the documents were not yet in the government's possession. *Id.* at 523. The court observed that government taint teams are primarily used in cases—like Snyder's—where the government has already gained control of the potentially privileged documents through a search warrant. *Id.* at 522–23. In those cases, the court explained, "the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege." *Id.*

Next, Snyder cites *In re Search of Electronic Communications*, 802 F.3d 516 (3d Cir. 2015), for the proposition that non-lawyer federal agents may not make privilege determinations. While this may be sound policy, the Third Circuit's order was not a constitutional holding but a prospective, cautionary measure designed to protect a privilege holder's rights. *Id.* at 530. The court did not find that review by non-attorney federal agents necessarily violated the attorney-client privilege, much less the Sixth Amendment.

Snyder's strongest support comes from *In re: Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019), but it too is readily distinguishable. As part of its investigation into "Lawyer A," an attorney at a Baltimore law firm suspected of aiding the crimes of "Client A," the government searched the law firm and seized "voluminous materials," including all of Lawyer A's email correspondence. *Id.* at 165–66. Only 0.2% of the seized emails were sent to or from Client A or contained his surname. *Id.* at 172. An "extensive" portion of the seized

emails concerned other firm clients, some of whom were also being investigated or prosecuted by the same U.S. Attorney's Office. *Id.* at 167. Invoking the attorney-client privilege, the law firm sought an injunction to stop the filter team of government employees from reviewing the seized communications. *Id.* at 168. The district court denied the firm's request, but the Fourth Circuit reversed and ordered that the magistrate judge conduct the privilege review. *Id.* at 170. The Fourth Circuit reasoned that the firm would be irreparably harmed if the government were permitted to view communications regarding its *other* clients. *Id.* at 172. The court also concluded that the firm was likely to succeed on the merits of its claim because the filter protocol approved by the magistrate judge impermissibly assigned judicial functions to the executive branch. *Id.* at 176.

Snyder's case is distinguishable. To start, *In re: Search Warrant* concerned the seizure of an attorney's email correspondence, not that of a client, and the Fourth Circuit was focused on the harm posed to clients other than Client A, the target of the government's investigation. The court also emphasized that the vast majority of seized emails—99.8%—were apparently unrelated to the government's investigation.

Despite these distinguishing facts, Snyder encourages us to read *In re: Search Warrant* as holding that *all* privilege reviews in criminal investigations must be performed by a judicial officer. We are not persuaded. The Fourth Circuit criticized the magistrate judge's approval of the filter protocol—which occurred before the law firm invoked privilege—on the grounds that resolution of privilege "disputes" is a judicial function. 942 F.3d at 176 (Once "a dispute arises as to whether" communications are privileged, "the resolution of

that dispute is a judicial function."). If the Fourth Circuit meant that once a claim of privilege is made, a court may not delegate its responsibility to resolve that dispute to the executive branch, then we agree. The district court in Snyder's case made no such error because Snyder asserted privilege after the government's filter process was complete. If, however, the Fourth Circuit meant what Snyder argues, that district courts must act as legal advisers to investigators or that resolving legal questions—before any claim of privilege is made or any concrete dispute arises—is a non-delegable judicial function, then we would need to disagree based on the limits of the judicial function. See *E.F.L. v. Prim*, 986 F.3d 959, 962 (7th Cir. 2021) ("The Constitution limits our jurisdiction to resolving live 'Cases' and 'Controversies,' rather than issuing advisory opinions."), quoting U.S. Const. art. III, § 2, cl. 1.

To be sure, where law enforcement has reason to expect that a search (electronic or otherwise) will sweep up privileged communications, it should take appropriate measures to avoid intruding on attorney-client relationships. We are not convinced, however, that the filter process used here would have been rejected by other circuits, nor do we agree that the Constitution required earlier participation of defense counsel or oversight by the district court.

In sum, Snyder's Sixth Amendment rights were not violated by the seizure and subsequent filtering of his emails because the right had not yet attached. Even if the right had attached, the filter process would not have violated his Sixth Amendment rights where there is no indication that the government purposefully intruded on the attorney-client relationship or that privileged materials were disclosed to

Snyder's detriment. The district court did not err in denying his motion to dismiss on this basis.

III. *Snyder's Conviction for Obstructing the IRS*

Next, we turn to Snyder's arguments challenging his conviction for obstructing the IRS. Snyder challenges this conviction on two grounds. First, he argues the prosecution was barred by the statute of limitations. Second, he insists that his conviction was not supported by sufficient evidence.

A. *Background*

Before he was elected mayor, Snyder owned and operated First Financial Trust Mortgage in Portage. After First Financial Trust Mortgage failed to pay its 2007, 2008, and 2009 payroll taxes in full, the IRS notified the company that its bank accounts would be levied in July 2009. By the end of 2009, First Financial Trust Mortgage owed nearly $100,000 in payroll taxes.

In January 2010, Snyder agreed with GVC Mortgage that Snyder would operate First Financial Trust Mortgage (under the same name and at the same location) as a division of GVC Mortgage. Soon after reaching this agreement with GVC Mortgage, Snyder opened a bank account in the name of SRC Properties. Snyder then created invoices on SRC letterhead billing First Financial Trust Mortgage for services. He forwarded the invoices to GVC Mortgage, which paid SRC Properties directly. The government argued that by routing payments directly to SRC Properties, Snyder was able to conceal assets from the IRS, which had levied First Financial Trust Mortgage's bank account.

During this time, Snyder was also behind in paying his personal taxes. In 2009, the IRS completed a civil audit of

Snyder's 2005, 2006, and 2007 personal tax returns. He was assessed roughly $30,000 in taxes, penalties, and interest. In December 2010 and February 2011, the IRS levied Snyder's personal bank accounts.

As part of his efforts to settle his personal tax debt and negotiate an installment plan with the IRS, Snyder submitted three 433-A forms: one in March 2010, one in January 2011, and one in April 2013. Each document required him to disclose fully his assets and liabilities under penalty of perjury. On all three forms, Snyder failed to report that he owned SRC Properties, and on the 2010 and 2013 forms, he omitted his employment with GVC Mortgage. In March 2011, Snyder agreed with the IRS to pay $112 per month. He paid off his personal tax debt in full in early 2016, six months before his indictment.

B. *Statute of Limitations*

In the district court, Snyder moved under Federal Rule of Criminal Procedure 7(d) to strike paragraphs 1–20 of Count 4 of the indictment as irrelevant and immaterial surplusage. Those paragraphs describe Snyder's failure to pay payroll taxes in 2007, 2008, and 2009, his partnership with GVC Mortgage, his creation of SRC Properties, and his efforts to direct payments from GVC Mortgage to SRC Properties. Snyder argued that the paragraphs described conduct that occurred before November 17, 2010, outside the six-year statute of limitations period for violations of 26 U.S.C. § 7212(a). See 26 U.S.C. § 6531(6). He also insisted that the challenged paragraphs had no bearing on his alleged obstruction of the IRS on his personal taxes.

The district court denied the motion. The court reasoned that the paragraphs were necessary to understand the alleged scheme and contained facts the government would need to prove at trial. The court recognized that the conduct alleged in the challenged paragraphs occurred outside the statute of limitations period, but it concluded that the alleged past conduct was "intertwined" with acts within the statute of limitations, "making the earlier acts relevant and proper to this case."

On appeal, Snyder argues that the district court erred in failing to dismiss the § 7212(a) charge on statute of limitations grounds. Specifically, he asserts that the district court erred by treating the scheme to obstruct the collection of payroll taxes as intertwined with the scheme to obstruct the collection of his personal taxes, which improperly brought the former within the statute of limitations period.

We review de novo a district court's denial of a motion to dismiss on statute of limitations grounds. *United States v. O'Brien*, 953 F.3d 449, 454 (7th Cir. 2020). Here, however, Snyder did not seek dismissal of the tax obstruction count. He moved only to strike paragraphs 1–20 of the tax count—which describe his efforts to impede collection of his payroll but not his personal taxes—as surplusage. We review a district court's denial of that motion for abuse of discretion. *United States v. O'Connor*, 656 F.3d 630, 645 (7th Cir. 2011). Regardless of how Snyder's challenge is characterized, we find no error.

The six-year statute of limitations clock for a violation of § 7212(a) begins to run on the date of the last corrupt act. *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997). To defeat a motion to dismiss the indictment in Snyder's case, the government needed to allege that Snyder engaged in an

affirmative act to obstruct the IRS on or after November 17, 2010. It did so with respect to both personal and payroll taxes. The indictment alleged that, from 2010 to 2013, Snyder impeded the collection of his company's payroll taxes by diverting payments from GVC Mortgage to SRC, which the IRS did not know about. With regard to his personal taxes, the indictment alleged that Snyder concealed the existence of SRC in 433-A forms he filed in March 2010, January 2011, and April 2013.

Snyder's insistence that the district court erroneously intertwined his payroll tax and personal tax conduct misreads the district court's order. The court simply recognized that, although paragraphs 1–20 did not describe conduct that occurred within the statute of limitations period, those paragraphs were essential to understand the government's allegations that Snyder impeded the collection of payroll taxes by diverting payments to SRC after November 17, 2010. The district court did not err.[3]

C.  *Sufficiency of the Evidence*

Snyder next argues that there was insufficient evidence to support the jury's verdict on the tax count. We will overturn a conviction only if, viewing the evidence in the light most favorable to the government, "no rational trier of fact could have found the essential elements of the crime beyond a

---

[3] Before he was indicted, Snyder signed three agreements waiving his right to be indicted within the statute of limitations period. On appeal, he stresses that he was indicted forty-five days after the third and final agreement expired. Because we find that the indictment alleged affirmative acts within the six-year limitations period, we need not consider these agreements.

reasonable doubt." *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018), quoting *United States v. Brown*, 726 F.3d 993, 1005 (7th Cir. 2013). While this is a high hurdle for defendants to clear, the "height of the hurdle depends directly on the strength of the government's evidence," and a "properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019), quoting *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019), quoting in turn *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013), and *Jackson v. Virginia*, 443 U.S. 307, 317 (1979).

A person violates the so-called "omnibus clause" of 26 U.S.C. § 7212(a) when he "corruptly or by force or threats of force … obstructs or impedes, or endeavors to obstruct or impede, the due administration of [the Internal Revenue Code]." 26 U.S.C. § 7212(a); see *Marinello v. United States*, 138 S. Ct. 1101, 1104–05 (2018) (explaining that § 7212(a) has an "Officer Clause" and an "Omnibus Clause"). To act "corruptly" means "to act with the intent to secure an unlawful advantage or benefit either for one's self or for another." *United States v. Kelly*, 147 F.3d 172, 177 (2d Cir. 1998). By "due administration" of the Internal Revenue Code, the statute refers to "targeted governmental tax-related proceedings, such as a particular investigation or audit," not the "routine administrative procedures that are near-universally applied to all taxpayers, such as the ordinary processing of income tax returns." *Marinello*, 138 S. Ct. at 1104. The administrative proceeding must have been pending or reasonably foreseeable to the defendant when he engaged in the obstructive conduct, and there must have been a nexus—a "relationship in time, causation, or logic"—between the defendant's obstructive conduct and the

proceeding. *Id.* at 1109–10, quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995).

The evidence here was sufficient to support the jury's verdict. Evidence at trial established that Snyder owed personal and payroll taxes and that the IRS had taken "specific, targeted" steps to collect by levying Snyder's personal and business bank accounts. See *Marinello*, 138 S. Ct. at 1106. The jury could conclude that Snyder impeded or attempted to impede the IRS's collection of owed taxes in two ways. First, with respect to his payroll tax debt, he diverted reimbursement payments from GVC Mortgage directly to SRC Properties, thereby evading the IRS's levy on First Financial Trust Mortgage's bank account. Second, with respect to his personal taxes, Snyder failed to report his ownership of SRC Properties and his employment with GVC Mortgage on 433-A forms he submitted to the IRS. The jury could reasonably conclude that misrepresenting assets and income in settlement and installment-plan negotiations with the IRS could have the effect of impeding the IRS's collection efforts. Finally, the jury could conclude that Snyder acted with the intent to gain an unlawful advantage. The evidence established multiple omissions on his 433-A forms. It also established that he opened the SRC bank account soon after he started working for GVC Mortgage and that he directed payments to SRC over several years, all while concealing his ownership of SRC from the IRS. Viewing the evidence in the light most favorable to the government, we find sufficient support for the jury's verdict.

Snyder's arguments to the contrary are not persuasive. He notes that his personal taxes were paid in full before he was indicted, and he insists that paying via an installment plan, which the IRS permits, is not obstructive and did not give him

any unlawful benefit. Snyder also disputes that he omitted information on the 433-A forms. In his accountant's copy of the 433-A form submitted in 2013, his ownership of SRC was reported on a page that is missing from the IRS's copy. He suggests that pages or attachments might also be missing from the 2010 and 2011 forms that reported his employment with GVC Mortgage and his ownership of SRC. Snyder further argues that he did not report income from SRC because the company made little or no money in the relevant years and that, in any case, his failure to report income from SRC could not have impeded the IRS. He also claims that, although he did not list GVC Mortgage as an employer on his 2013 433-A form, he accurately reported his gross wages on that form. With regard to his payroll tax debt, Snyder argues that First Financial Trust Mortgage dissolved on June 14, 2010, and that he did not own GVC Mortgage, so any income earned by First Financial Trust Mortgage after that date could not be levied to pay its payroll taxes.

Snyder's arguments were appropriate before the trial jury, but they do not entitle him to acquittal as a matter of law. The fact that he eventually paid his personal taxes on an installment plan did not prevent the jury from finding that he concealed income sources and assets from the IRS earlier in the process to try to obtain a favorable settlement. There is of course nothing per se obstructive about settling with the IRS or paying overdue taxes in installments. But evidence at trial showed that the IRS seeks to obtain a complete picture of a taxpayer's income and assets so it can make a "fair assessment" when deciding whether to agree to a settlement or installment plan. A reasonable jury could conclude that Snyder omitted income and asset information on his 433-A forms in hopes of receiving a more favorable deal with the IRS.

Likewise, while the jury might have credited Snyder's assertions that he reported his ownership of SRC Properties on pages or attachments that were missing from the IRS's files, the jury was not required to draw that conclusion. The revenue agent testified that Snyder should have reported his ownership of SRC Properties at several places on the 433-A form he submitted in 2013, not just on the page missing from the IRS's copy. The jury might also have rejected Snyder's argument given that he failed to report his ownership of SRC Properties on the 433-A forms he filed in 2010 and 2011 as well.

We are similarly unpersuaded by Snyder's argument that his failure to report his modest income from SRC Properties could not have obstructed the IRS. The jury heard that thousands of dollars were deposited into and then withdrawn from SRC's bank account each month. While this might have left Snyder with only modest net income each month, the jury could have reasonably credited the revenue agent's testimony that Snyder's ownership of SRC Properties would have been important to the IRS in assessing his ability to pay.

Nor are we convinced that Snyder is entitled to an acquittal because, as he argues, he reported his wages from GVC Mortgage on the 433-A form he submitted in 2013 even though he failed to list GVC Mortgage as his employer on that form. First, while the revenue agent testified that it was possible, no evidence at trial established that Snyder's GVC Mortgage wages were included in the aggregate wage amount listed on the 2013 form. Second, the jury was not required to credit Snyder's argument given evidence of his other omissions on the 433-A forms, including his failure to report his employment with GVC Mortgage or any wages on the 433-A form he filed in 2010.

Finally, the jury could reasonably conclude that Snyder diverted payments from GVC Mortgage to SRC to avoid the IRS's levy on First Financial Trust Mortgage's bank account and thereby to impede the IRS. While Snyder's mortgage company was administratively dissolved in June 2010, the jury heard evidence that the IRS continued its attempts to collect and sent levy notices to First Financial Trust Mortgage in August 2011. The jury could reasonably conclude that routing payments to SRC obstructed, or had the potential to obstruct, the IRS's efforts to collect First Financial Trust Mortgage's payroll taxes. Sufficient evidence supported the jury's verdict.[4]

IV. *Challenges to Snyder's Conviction for Federal Funds Bribery*

Last, we consider several challenges to Snyder's conviction for federal funds bribery. First, Snyder argues that his statutory and constitutional rights to a speedy trial were violated by the delay between his first and second trials. Second, he insists that 18 U.S.C. § 666(a)(1)(B) applies to bribes but not to gratuities and therefore does not apply to his case. He contends that the district court erred when it rejected his statutory argument, which he presented in a motion to dismiss, a proposed jury instruction, and a motion for judgment of acquittal. Finally, Snyder argues that the evidence was not sufficient at either trial to support a guilty verdict.

---

[4] Snyder also argues that the district court erred in admitting emails from a friend regarding Snyder's financial records. He insists that the emails were unfairly prejudicial. Framed as a challenge to the sufficiency of the evidence rather than as an evidentiary error, we find no reversible error. The emails were properly admitted and supported the jury's verdict.

A. *Background*

Snyder took office as mayor of Portage in January 2012. In January 2013 and December 2013, Portage awarded two contracts worth a total of $1.125 million to Great Lakes Peterbilt (GLPB), the trucking company owned by Robert and Stephen Buha. As state law required, the contracts were awarded through public bidding overseen by the City of Portage Board of Works and Public Safety. The Board was composed of Mayor Snyder and two of his appointees. Snyder put his long-time friend, Randy Reeder, in charge of the bidding process, even though Reeder had no experience administering public bids.

On December 13, 2012, the city issued the first invitation to bid. The invitation sought bids to sell three garbage trucks. It specified that the trucks must be unused and the manufacturer's current production model. At trial, the government presented evidence that Reeder tailored the bid specifications to favor GLPB. Reeder testified that he based the chassis specifications on a Peterbilt chassis, which naturally favored the Buhas' Peterbilt dealership. Reeder also specified that the trucks must be delivered within 150 days, a deadline that was suggested to him by GLPB, but was an unusually fast turnaround for a new garbage truck.

Roughly two weeks before the Board of Works was scheduled to meet to award the first contract, Reeder circulated a chart summarizing the bids. He highlighted GLPB's bid and calculated the difference between its bid and every other bid. At the Board of Works meeting on January 28, 2013, the Board was informed that only GLPB's bid was fully responsive to the invitation's specifications, including the 150-day delivery

deadline. Mayor Snyder's appointee moved to award the contract to GLPB, and the Board voted in favor.

That same month, the manager of GLPB approached Reeder to see whether the city wanted to purchase an unused, 2012 model truck that had been sitting on GLPB's lot for two years. Mayor Snyder first tried to purchase the truck outright, but he was informed by the city attorney that the truck was too expensive to be purchased without going through the public bidding process.

The Board of Works then announced a second bid for two garbage trucks on November 15, 2013. Again, the bid invitation specified that the trucks should be unused and the manufacturer's current production model. The invitation to bid sought two trucks, but it specified a smaller engine and transmission for one of the trucks. Reeder testified that he adjusted those specifications to match the truck sitting on GLPB's lot. A mechanic for the city testified that, from a maintenance standpoint, it made little sense to purchase trucks with different specifications.

GLPB was the lowest responsive, responsible bidder, and it was awarded the second contract at a Board of Works meeting on December 23, 2013. Neither Reeder nor Mayor Snyder informed the Board that one of the trucks it was purchasing from GLPB was a 2012 model, so it did not meet the bid specifications.

Evidence at trial showed that Snyder was in frequent contact with the Buha brothers around the time of the second-round bid. Mayor Snyder's calendar showed a scheduled lunch with Robert Buha on December 12, 2013, one day before the second-round bids were due. Phone records revealed

twenty-nine phone calls or text exchanges between the mayor and the Buha brothers in the four weeks between the announcement of the second-round bid and the date the bids were due. Records showed an additional eighteen phone calls or text messages between Snyder and the Buhas in the ten days after bids were due until the contract was awarded. Mayor Snyder did not have phone contacts with any other bidders during that time.

Robert Buha testified that shortly after GLPB was awarded the second-round bid, Snyder visited the Buha brothers at the GLPB dealership to ask for $15,000. He told the Buhas that he needed the money to pay off his tax debt and to cover holiday expenses. Buha testified that the brothers agreed to pay Snyder $13,000 up front supposedly for consulting services he intended to provide.

On January 10, 2014, GLPB issued a $13,000 check to Snyder. GLPB's controller, who issued the check at Robert Buha's direction, testified that Buha told him they were paying Mayor Snyder for his influence. When the FBI later questioned Snyder about the check, he insisted it was payment for health insurance and information technology consulting he had provided to GLPB. But Mayor Snyder had also told Reeder that the $13,000 check was for payroll and telephone consulting he performed for GLPB. And Mayor Snyder had told someone else, a city planning consultant, yet another story: that GLPB paid him to lobby the state legislature on its behalf.

Robert Buha testified that he had conversations with Snyder about his employees' health insurance and IT upgrades, but that in his opinion, Snyder's services did not justify $13,000. GLPB employees, including the controller,

testified that to the best of their knowledge, Snyder did not perform any consulting work for the company.

B. *Speedy Trial Rights*

After a jury found Mayor Snyder guilty of federal funds bribery, the district court granted his motion for a new trial on that count on November 27, 2019. On November 19, 2020, Snyder moved to dismiss the bribery count, arguing that his retrial would fall outside the 70-day period permitted by the Speedy Trial Act and would violate his Sixth Amendment right to a speedy trial. The district court denied the motion. *United States v. Snyder*, No. 2:16-cr-160, 2021 WL 369674, at *1 (N.D. Ind. Feb. 3, 2021). We address Snyder's statutory argument and then his constitutional argument.

1. *Speedy Trial Act*

When a defendant is to be retried after an order for a new trial, the Speedy Trial Act requires that the second trial commence within 70 days "from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). The Act allows certain periods of delay, identified in § 3161(h), to be excluded from consideration in calculating the 70-day period.

Relevant here, § 3161(h)(7)(A) provides that any period of delay resulting from a continuance will be excluded "if the judge granted [the] continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." The Act requires the court to "se[t] forth, in the record of the case, either orally or in writing" these findings. *Id.* If the court fails to do so, the time shall not be excluded. *Id.* Section 3161(h)(7)(B) provides a non-exclusive list of factors the court shall consider in deciding whether to grant a continuance.

The statutory issue in this appeal boils down to whether one specific 45-day continuance from December 7, 2019 to January 20, 2020, granted on the government's motion, should be excluded under the Act. At a hearing nine days after Snyder's motion for a new trial was granted, the government explained that the U.S. Attorney's Office for the Northern District of Illinois, which was supervising Snyder's prosecution due to recusals by attorneys in the Northern District of Indiana, had not decided whether to retry Snyder. The government requested a 45-day continuance so that supervisors in Chicago could review the trial transcripts and make an "informed decision" regarding retrial. The government also asked that the "45-day time period be excluded in the interests of justice."

Judge Van Bokkelen asked defense counsel if they had "any problem with that?" Counsel replied, "I don't think so." Judge Van Bokkelen then asked, "By don't think so, is that going to change?" Counsel replied it would not and said specifically that Snyder did "not object on a speedy trial basis." Judge Van Bokkelen granted the motion and ordered that the docket entry note that the delay was excluded under the Speedy Trial Act in the interests of justice.

Snyder contends that the 45 days should not have been excluded because Judge Van Bokkelen failed to state sufficiently on the record his findings that the continuance was in the interests of justice. Snyder argues further that it was an abuse of discretion to exclude the 45 days because the case was not sufficiently complex to merit the continuance.

The district court, which denied Snyder's motion to dismiss under the Speedy Trial Act, excluded the 45 days from its calculation. *Snyder*, 2021 WL 369674, at *4. Among other reasons, the court found that Snyder had forfeited or waived

the issue of that particular continuance by failing to develop it in his initial brief. In his initial motion to dismiss in the district court, Snyder presented his Speedy Trial Act calculation in a chart that listed periods of time and designated each as excluded or not excluded. He designated the 45-day continuance as excluded, with the notation that the days were "waived pursuant to Mr. Snyder's agreement … but see fn. 3." In that footnote 3, Snyder asserted, without explanation, that the continuance was not supported by an "ends of justice" finding, and he questioned whether his waiver could effectively exclude the time. He then wrote that, "For purposes of the record only," his position was that the 45 days were *not* excluded. But because he believed the government had exceeded the allowed 70 days even excluding the 45-day continuance, he said he would "not push the point."

As we see the situation, the district court tried to make a clear record on the defense response to the continuance. When counsel hedged at first ("I don't think so"), the judge rightly pressed for a more definitive position and got it: counsel said Snyder would not object on a speedy trial basis. And when Snyder and his counsel later briefed the speedy trial motion, they hedged more, but their clearest signal was that they would not "push the point" of the particular 45-day continuance.

The deliberately ambiguous dance around this 45-day continuance came very close to inviting error, which would certainly foreclose appellate review. Whether invited or not, Snyder certainly waived the issue by telling the district court he was not going to "push the point," so appellate review is also foreclosed on that basis. See *United States v. Cook*, 406 F.3d 485, 487 (7th Cir. 2005) ("A forfeiture is basically an oversight;

a waiver is a deliberate decision not to present a ground for relief that might be available in the law."). Even if Snyder had not expressly declined to press the argument, the footnote's "skeletal" argument, which was "really nothing more than an assertion," was insufficient to preserve his claim. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); see also *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"), quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). Although Snyder developed the argument in his reply brief in the district court, that was "too little, too late, for '[a]rguments raised for the first time in a reply brief are [also] waived.'" *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005), quoting *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998); see also *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006) (finding waiver where defendant did not develop issue in initial brief and raised it "in a meaningful way only in his reply brief").

While we have some discretion to consider waived arguments for compelling reasons, we see no reason to exercise such discretion here. Snyder agreed to exclude the 45 days, and the continuance furthered the interests of justice by giving supervisors overseeing Snyder's prosecution time to review transcripts and to make a considered choice regarding his retrial.

### 2. *Sixth Amendment*

We consider four factors in deciding whether a defendant's Sixth Amendment right to a speedy trial has been violated: "(1) the length of the delay, (2) the reasons for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) any prejudice the defendant suffered by the delay."

*Hart v. Mannina*, 798 F.3d 578, 596 (7th Cir. 2015), citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

The district court found no violation of Snyder's Sixth Amendment rights. *Snyder*, 2021 WL 369674, at *8. Because more than one year had passed since the order was issued granting Snyder a retrial, the court recognized that the delay was presumptively prejudicial. *Id.* at *7. The court, however, found that other factors weighed against finding a Sixth Amendment violation.

The court observed that the delay in Snyder's case was caused largely by the global pandemic, which made holding trials unsafe for jurors, parties, and court staff. The court said this delay was justifiable and could not be attributed to the prosecution.

The court also noted that some of the delay resulted from consideration of motions Snyder filed and was therefore attributable to him. Snyder asserted his speedy trial right on November 2, 2020, but the court reasoned that this factor did not weigh strongly in his favor because he asserted his right after the delays of which he complained. *Id.*

Finally, the court concluded that Snyder—who was not in pre-trial detention, did not complain of undue anxiety or concern while awaiting trial, and did not argue that his defense was hampered in any way—was not prejudiced by the delay. *Id.* at *8. Weighing these factors together, the court concluded that Snyder's constitutional right to a speedy trial was not violated. *Id.* We review a district court's denial of a constitutional speedy trial claim de novo and its findings of fact for clear error. *United States v. Bell*, 925 F.3d 362, 375–76 (7th Cir. 2019).

We agree that the first factor favors Snyder. The delay was "presumptively prejudicial" because more than one year passed between the order for a new trial in November 2019 and Snyder's second trial in March 2021. *O'Connor*, 656 F.3d at 643. Snyder timely asserted his speedy trial right on November 2, 2020, so we also weigh the third factor in his favor.

When assessing the second factor, we ask "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett v. United States*, 505 U.S. 647, 651 (1992). The district court found that the delay between Snyder's first and second trials was principally due to the Covid-19 pandemic. We agree with the district court that the pandemic-related delays in Snyder's case were justifiable and cannot fairly be attributed to the government. See *United States v. Keith*, 61 F.4th 839, 853 (10th Cir. 2023) (treating pandemic-related delays as a "neutral" factor favoring neither side). On appeal, Snyder does not challenge the district court's determination that the delay was also caused by motions he filed. We therefore weigh this factor against Snyder.[5]

We also weigh the fourth factor against Snyder. We assess prejudice "in light of the interests the Sixth Amendment seeks to protect," namely, preventing oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that his defense will be impaired. *Bell*,

---

[5] In his opening brief, Snyder agreed with the district court's finding that the delay between his first and second trials was largely due to the pandemic. In his reply, he challenged the district court's determination as error. Because he conceded the point in his opening brief, any challenge to the district court's determination is waived.

925 F.3d at 376, quoting *United States v. Harmon*, 721 F.3d 877, 883 (7th Cir. 2013). Snyder was not held in pre-trial detention.

Snyder argues that his defense was prejudiced by the fading memories of four witnesses who would have otherwise exonerated him. We are not convinced. Two of those witnesses, Reeder and Joseph Searle, claimed not to remember certain facts on the stand, but both had testified at Snyder's first trial. The fact that Reeder's and Searle's previous testimony was available to refresh their memories or to impeach their later testimony belies Snyder's contention that, if he had been tried earlier, Reeder and Searle could have exonerated him.

Snyder also claims he was prejudiced by Robert Buha's inability to remember the consulting work Snyder had supposedly performed for GLPB. In fact, Buha testified that Snyder consulted on healthcare and information technology issues faced by GLPB. In any case, Buha was questioned about GLPB's supposed consulting agreement with Snyder well before the second trial. The parties had the benefit of his statements to the FBI and his grand jury testimony on the matter, which were used to refresh his memory on the stand.

Finally, Snyder complains that John Beck, the city mechanic, had forgotten that he, not Snyder, was the source of the 150-day deadline in the first-round bid. Snyder bases this assertion on an FBI agent's notes from an interview with Beck in 2015 indicating that Beck suggested the 150-day deadline. Snyder used the agent's notes to impeach Beck's testimony. Confronted with the agent's report, Beck insisted that the agent had misunderstood him and that he had corrected the misunderstanding with the FBI soon after the interview. We

cannot see how an earlier trial would have changed Beck's testimony or its impact on the trial.

In sum, although the delay in Snyder's case was presumptively prejudicial and he asserted his speedy trial right, he is more to blame for the delay than the government, and he has not shown prejudice from the delay. The district court did not err in rejecting his Sixth Amendment speedy trial challenge.

C. *The Scope of 18 U.S.C. § 666—Bribes and Gratuities?*

Next, Snyder contends that 18 U.S.C. § 666 does not apply to the facts here. Recall that the payment to Mayor Snyder was made after both of the city's truck purchases. Snyder argues that the evidence showed at worst a gratuity rather than a bribe. Here's the difference. A bribe requires a *quid pro quo*—an agreement to exchange this for that, to exchange money or something else of value for influence *in the future*. A gratuity is paid "as a reward for actions the payee has already taken or is already committed to take." *United States v. Agostino*, 132 F.3d 1183, 1195 (7th Cir. 1997). Snyder insists that the evidence does not support a finding that he and the Buhas agreed to exchange money for the truck contracts *before* they were awarded. Without a prior *quid pro quo* agreement, he argues, § 666 cannot apply.

Snyder pressed this argument at several points in the district court. Before trial, he moved to dismiss the count from the indictment. At trial, he proposed a jury instruction that would have defined bribe, reward, and gratuity and instructed the jury to acquit if the government proved that he solicited or accepted only a gratuity, agreed to and paid only after the fact. After trial, he again argued in his motion for acquittal that the evidence did not support a finding that he and

the Buhas had entered into an agreement *before* the contracts were awarded as, he argued, the statute requires. The district court denied each of these challenges, citing precedent from this court holding that § 666 applies to gratuities as well as bribes.

The district court correctly rejected Snyder's proposed reading of § 666. We start with the statutory text. In relevant part, § 666(a)(1)(B) makes it a crime for an agent of a state or local government receiving federal funds to "corruptly solicit[ ] or demand[ ] for the benefit of any person, or accept[ ] or agree[ ] to accept, anything of value from any person, intending to be influenced or rewarded in connection with" any government business or transaction worth $5,000 or more. 18 U.S.C. § 666(a) & (b). The governing statutory language does not use the terms "bribe" or "gratuity." The statutory language "influenced or rewarded" easily reaches both bribes and gratuities.[6]

This circuit has repeatedly held that § 666(a)(1)(B) "forbids taking gratuities as well as taking bribes." *United States v. Hawkins*, 777 F.3d 880, 881 (7th Cir. 2015); *United States v. Johnson*, 874 F.3d 990, 1001 (7th Cir. 2017). That is, we have refused to "import an additional, specific *quid pro quo* requirement into the elements" of § 666. *Agostino*, 132 F.3d at 1190; *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005); *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011); *United States v. Mullins*, 800 F.3d 866, 871 (7th Cir. 2015). Many other circuits have

---

[6] The title of the codified § 666 refers to "Theft or bribery concerning programs receiving Federal funds," without mentioning gratuities, but the same is true of 18 U.S.C. § 201, "Bribery of public officials and witnesses," which all agree covers both bribes paid to federal officials in § 201(b) and gratuities paid to them in § 201(c).

taken the same position. See, e.g., *United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007); *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018); *United States v. Zimmermann*, 509 F.3d 920, 927 (8th Cir. 2007); *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010).

Snyder asks us to reconsider our precedent in light of contrary decisions by the First and Fifth Circuits in *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013), and *United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022). Both cases held that § 666 does not apply to gratuities.

The First and Fifth Circuits relied on similarities between the language of § 666 and that of 18 U.S.C. § 201(b), which criminalizes bribery of federal officials. (A different subsection, 18 U.S.C. § 201(c), criminalizes gratuities paid to or received by federal officials.) Specifically, the courts interpreted the words "corruptly" and "influence" in § 666 as evidence that the statute requires a prior *quid pro quo* agreement. *Fernandez*, 722 F.3d at 22; *Hamilton*, 46 F.4th at 397.

The First and Fifth Circuits also compared the punishments imposed by § 666 to those imposed by § 201(b) and § 201(c). Violations of § 201(c), the federal gratuity provision, are punishable by up to two years in prison, far less than the possible ten-year sentence for violations of § 666. See 18 U.S.C. §§ 201(c) & 666. The First and Fifth Circuits reasoned that the ten-year maximum imposed by § 666 was more in line with the fifteen-year maximum sentence for violations of § 201(b), the federal bribery provision. *Fernandez*, 722 F.3d at 24; *Hamilton*, 46 F.4th at 398; see also 18 U.S.C. § 201(b).

*Fernandez* and *Hamilton* do not persuade us to overrule our precedents on this statute. "We do not lightly overturn circuit

precedent, and we give 'considerable weight to prior deci-
sions of this court unless and until they have been overruled
or undermined by the decisions of a higher court, or other su-
pervening developments.'" *Wesbrook v. Ulrich*, 840 F.3d 388,
399 (7th Cir. 2016), quoting *Santos v. United States*, 461 F.3d
886, 891 (7th Cir. 2006). We understand the reasoning of the
First and Fifth Circuits, and in particular the odd difference in
possible sentences for illegal gratuities paid to federal officials
and those paid to state and local officials. Still, for several rea-
sons in addition to *stare decisis*, we are not persuaded to over-
rule our decisions holding that § 666 applies to gratuities.

First, as we have explained, the word "rewarded" in
§ 666—which is not found in the federal bribery provision—
is a strong indication that § 666 covers gratuities as well as
bribes. *Johnson*, 874 F.3d at 1001; see also *United States v. Sun-
Diamond Growers of California*, 526 U.S. 398, 405 (1999) (defin-
ing an illegal gratuity under § 201(c) as "a *reward* for some fu-
ture act that the public official will take (and may already
have determined to take), *or for a past act that he has already
taken*") (emphasis added). Second, while we recognize the dis-
parate penalties imposed for gratuities paid to local officials
compared to those paid to federal officials, that difference is
mitigated by the additional requirement in § 666 that the re-
ward be paid or received "corruptly," i.e., with the knowledge
that giving or receiving the reward is forbidden. *Hawkins*, 777
F.3d at 882. Third, the approach of the First and Fifth Circuits
produces its own disparity of a different sort: gratuities paid
to federal officials are criminalized, whereas gratuities paid to
state and local officials are not under federal law.

Accordingly, we follow here our precedents holding that
18 U.S.C. § 666 applies to gratuities and does not require

evidence of a prior *quid pro quo* agreement. The district court did not err when it refused to dismiss the count from the indictment, when it declined to give Snyder's proposed jury instruction, or when it denied his motion for judgment of acquittal.

### D. *Sufficiency of the Evidence*

Last, Snyder argues that even if § 666(a)(1)(B) applies to gratuities, the evidence was not sufficient at either of his trials to convict. Again, we will overturn a conviction for insufficient evidence only if, viewing all evidence in the light most favorable to the prosecution, no rational trier of fact could have found the defendant guilty. E.g., *Maldonado*, 893 F.3d at 484; see also *Moreno*, 922 F.3d at 793; *Garcia*, 919 F.3d at 496–97.

To prove a violation of 18 U.S.C. § 666(a)(1)(B), the government must show that a public agent "corruptly" solicited or accepted something of value "intending to be influenced or rewarded" in connection with a transaction of $5,000 or more. 18 U.S.C. § 666(a)(1)(B); see *Mullins*, 800 F.3d at 870. A public agent acts "corruptly" when "he understands that the payment given is a bribe, reward, or gratuity." *Id.* The parties agree that the truck contracts were worth at least $5,000 and that Mayor Snyder was an agent of Portage, which received enough federal funding to be covered by § 666. His argument on appeal is that the evidence was insufficient at either trial for a reasonable jury to find that he solicited the $13,000 check intending to be influenced or rewarded in connection with the two contracts awarded to GLPB.

Snyder challenges the sufficiency of the evidence at both trials, so we must consider the evidence presented to both

juries. (If the evidence at the first trial had been legally insufficient to convict, the Double Jeopardy Clause would have barred the second trial. See *Burks v. United States*, 437 U.S. 1, 18 (1978); *Webster v. Duckworth*, 767 F.2d 1206, 1207 (7th Cir. 1985).) Viewing the evidence in each trial in the light most favorable to the government, we find ample support for the juries' verdicts. Mayor Snyder put his good friend Reeder in charge of the bidding process even though Reeder had no experience administering public bids. Reeder then tailored both bid requirements to favor GLPB. In the first-round invitation, Reeder based the chassis specifications on a Peterbilt chassis, and after GLPB told Reeder it could deliver trucks in 150 days, Reeder included a 150-day deadline. In the second round, Reeder tailored the bid specifications to match the truck that had been sitting on GLPB's lot even though the truck was not the manufacturer's current model. The second invitation to bid was issued after Mayor Snyder tried unsuccessfully to purchase the GLPB truck outright. Evidence at both trials established that Snyder communicated with the Buhas around the time of the second-round bid.

Less than three weeks after the second contract was awarded to GLPB, the Buhas had GLPB pay Snyder $13,000. When questioned by the FBI, Snyder claimed the $13,000 check was payment for healthcare and information-technology consulting he performed for GLPB. When pressed for specifics, Snyder could not identify any work product he provided GLPB. He said that he went to meetings and "discussed things." Although Snyder claimed to have advised GLPB on healthcare options after passage of the Affordable Care Act, he could not recall what decision GLPB made regarding its employees' insurance coverage. The government subpoenaed GLPB and Snyder for all documentation, correspondence,

work product, and billing records related to Snyder's consulting work for GLPB. No such evidence was produced.

Given irregularities in the bidding process, Snyder's contemporaneous contacts with the Buhas (unique among bidders), the timing of the $13,000 payment, the dubious explanations offered for the payment, and the lack of corroborating evidence for Snyder's claim that he was paid for consulting, a reasonable jury could conclude that Snyder accepted the check as a bribe or gratuity for steering the contracts to GLPB.

Snyder's arguments to the contrary are unpersuasive. He argues that the evidence at his first trial was insufficient because the government did not provide direct evidence that he intended to be influenced or rewarded when he accepted the $13,000. This argument is a nonstarter. A verdict may be rational even if it relies on circumstantial evidence, especially of the defendant's state of mind. *United States v. Lawrence*, 788 F.3d 234, 242 (7th Cir. 2015).

Next, Snyder contends that he is entitled to a judgment of acquittal because the government failed to show that the $13,000 check was a bribe or gratuity in connection with *both* rounds of bidding, as opposed to only the second round. This is incorrect as a matter of both law and fact. As a point of law, evidence at trial need not exactly match allegations made in the indictment. See generally *United States v. Miller*, 471 U.S. 130, 136 (1985). As a point of fact, when viewed in the light most favorable to the government, evidence at trial showed that Reeder—whom Snyder put in charge of the bidding process—drafted the chassis and deadline specifications in the first round to favor GLPB.

Finally, Snyder insists that a rational jury would have to conclude that he performed *some* work for GLPB, which would make the $13,000 check bona fide income, not a bribe or gratuity. We disagree. A reasonable jury could conclude that even if Snyder spoke with the Buhas and on occasion offered his advice, the $13,000 check was not paid for consulting services. In response to the government's subpoenas, neither Snyder nor the Buhas could produce a contract, billing records, work product, or any other documentation showing that Snyder worked for GLPB. This, as well as evidence that Reeder crafted both bids to favor GLPB, the timing of the payment, and Snyder's contemporaneous communication with the Buhas, permitted a reasonable jury to conclude that the $13,000 check was not payment for consulting services. The evidence was sufficient to support both juries' verdicts.[7]

The judgment of the district court is AFFIRMED.

---

[7] Snyder also argues that the reasoning of the district court, which denied his motions for acquittal after both trials, was flawed in several respects. He asks this court to find the evidence insufficient based on what he characterizes as unreasonable inferences drawn by the district court. On a challenge to the sufficiency of the evidence, we do not defer to the district court's reasoning. *United States v. Harris*, 51 F.4th 705, 714 (7th Cir. 2022). Rather, our focus is on the evidence presented at trial and whether, viewing that evidence in the light most favorable to the government, any rational trier of fact could find Snyder guilty. We therefore need not address or defend every inference drawn by the district court.